J-S55045-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: K.A.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.M., FATHER | No. 922 EDA 2014 |

Appeal from the Decree February 25, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000444-2013
CP-51-DP-0001953-2011
FID# 51-FN-000993-2011

BEFORE: BOWES, J., SHOGAN, J., and OTT, J.

MEMORANDUM BY OTT, J.:                    **FILED OCTOBER 16, 2014**

S.M. ("Father") appeals from the decree entered on February 25, 2014, in the Court of Common Pleas of Philadelphia County, involuntarily terminating his parental rights to his daughter, K.A.M. ("Child"), born in January of 2008.[1]  We affirm.

The trial court provided the following relevant background of this case in its opinion pursuant to Pa.R.A.P. 1925(a):

> [Child] is currently six (6) years old and is placed in kinship foster care with her maternal grandmother.  The family became known to the Department of Human Services ("DHS") on March

---

[1] By decree also entered on February 25, 2014, the trial court involuntarily terminated the parental rights of K.A.M.'s mother, P.P., who did not file a notice of appeal.

28, 2008 pursuant to a general report that stated that the Child tested positive for opiates at her birth on January [ ], 2008. On September 29, 2011, DHS filed a dependency petition for the Child. An adjudicatory hearing was scheduled for October 25, 2011. On October 7, 2011, Father filed a Motion for Continuance regarding the adjudicatory hearing. In his Motion for Continuance, Father stated that he was incarcerated at SCI-Forest and would be released on November 4, 2011. On October 25, 2011[,] the Court granted Father's request for a continuance on the grounds to allow Father to be present at the next court date. The next court date was the adjudicatory hearing held on November 15, 2011, wherein the Child was adjudicated dependent and committed to the custody of DHS. Father did not attend the adjudicatory hearing.[2]

Trial Court Opinion, 5/9/14, at 1-2 (citations to record omitted).

On August 8, 2013, DHS filed a petition for the involuntary termination of parental rights of Father pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). On the same date, DHS filed a petition for a goal change to adoption. A hearing was held on the petitions on February 25, 2014, during which the following witnesses testified: Brian Bell, DHS caseworker; Kiana Sawyer, Delta Social Services caseworker; and Father. By decree dated and entered on February 25, 2014, the trial court involuntarily terminated Father's parental rights. Additionally, by order the same date, the court changed Child's goal to adoption. Father timely filed a notice of appeal and

---

[2] The certified record reveals that Father's counsel, James W. Martin, Esquire, was appointed by the court on October 18, 2011, to represent Father at the adjudicatory hearing, and he appeared at the hearing. **See** Adjudication, 11/15/11. We note that Attorney Martin represented Father in both the dependency and termination matters.

a concise statement of errors complained of on appeal pursuant to Pa.R.A.P.

1925(a)(2)(i) and (b).[3]

On appeal, Father presents the following issues for our review:

1. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Father], when [DHS] failed to provide reasonable efforts to reunify the family[?]

2. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Father], under 23 Pa.C.S.A. § 2511 subsections (a)(1), (a)(2), (a)(5), and § 2511(a)(8)?

3. Whether the [t]rial [c]ourt erred by finding, under 23 Pa.C.S.A. § 2511(b), that termination of [Father's] parental rights best serves the child's developmental, physical and emotional needs and welfare?

Father's brief at 4.

We review the decree involuntarily terminating Father's parental rights

according to the following standard.

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, [614

___

[3] Although Father appealed from both the termination decree and the goal change order, we conclude he has waived any challenge to the goal change order by his failure to raise any issue related to the order in his Statement of Questions Involved in his appellate brief. *See Krebs v. United Refining Company of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that any issue not set forth in or suggested by an appellate brief's statement of questions involved is deemed waived).

Pa. 275,] 36 A.3d [567,] 572 [(Pa. 2011) (plurality)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 613 Pa. 371, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 575 Pa. 647, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 539 Pa. 161, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the

needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S.A. § 2511). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Instantly, we review the decree pursuant to Section 2511(a)(1) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A § 2511(a)(1), (b); **see also In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (stating that, this Court need only agree with any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights).[4]

With respect to Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." **In re Z.S.W.**, 946 A.2d 726, 730 (Pa. Super. 2008) (citing **In re Adoption of R.J.S.**, 901 A.2d 502, 510 (Pa. Super. 2006)). Further,

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

**Id.** (quoting **In re Adoption of Charles E.D.M.**, 708 A.2d 88, 92 (Pa. 1998)).

In **In re Adoption of S.P.**, **supra**, our Supreme Court discussed **In re Adoption of McCray**, 331 A.2d 652 (Pa. 1975), a case wherein the

---

[4] We note that Sections 2511(a)(5) and (8) do not provide a basis for the termination of Father's parental rights because Child was not removed from his care. **See In re C.S.**, 761 A.2d 1197 (Pa. Super. 2000) (*en banc*); **see also In re Z.P.**, 994 A.2d 1108 (Pa. Super. 2010).

Court considered the issue of the termination of parental rights of incarcerated persons involving abandonment, which is currently codified at Section 2511(a)(1). The **S.P.** Court stated:

> Applying in **McCray** the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." **Id.** at 655. We observed that the father's incarceration made his performance of this duty "more difficult." **Id.**

*In re Adoption of S.P.*, 47 A.3d at 828. The **S.P.** Court continued:

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. *Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child.* Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.
>
> [**McCray**] at 655 (footnotes and internal quotation marks omitted). . . .

*In re Adoption of S.P.*, *supra* (emphasis added); *see also In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (internal citations omitted) (stating that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child").

With respect to Section 2511(b), this Court has explained the requisite analysis as follows:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and

emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

In his first issue on appeal, Father argues that DHS failed to provide reasonable efforts to promote reunification in this case. Specifically, Father asserts that, although DHS knew he was incarcerated in 2012 and 2013, and knew he was in a halfway house in 2014, DHS failed to provide him with his Family Service Plan ("FSP") objectives. In addition, Father asserts that DHS never provided him with an address to keep in contact with Child. Father asserts that DHS "never made any efforts to secure mental health treatment" for him, and never contacted him to provide any assistance. Father's brief at 12. Finally, Father asserts that he "found out who his DHS social worker was when [he] received a petition to terminate his parental rights." *Id*. at 12-13. Upon careful review, we discern no error or abuse of discretion by the trial court in granting the involuntary termination petition.

It is well-established that child welfare agencies must make reasonable efforts to reunify a parent with his or her child prior to filing a termination

petition. *See In re Adoption of R.J.S.*, 901 A.2d 502, 507 (Pa. Super. 2006); *see also In the Interest of D.C.D.*, 91 A.3d 173, 179 (Pa. Super. 2014), *appeal granted*, 93 A.3d 802 (Pa. 2014). However, the duties of agencies have reasonable limits. "If a parent fails to cooperate or appears incapable of benefiting from reasonable efforts supplied over a realistic period of time, the agency has fulfilled its mandate and upon proof of satisfaction of the reasonable good faith effort, the termination petition may be granted." *In re A.L.D., Jr.*, 797 A.2d 326, 340 (Pa. Super. 2002) (citation omitted).

Recently, in *In the Interest of D.C.D.*, *supra*, this Court concluded that the finding of the orphans' court that the child welfare agency failed to make reasonable efforts to assist the father prior to filing an involuntary termination petition required the reversal of the decree involuntarily terminating the father's parental rights.

In that case, the father had become incarcerated before the child's birth and remained so throughout the child's life. Nevertheless, the record demonstrated that the father took an active interest in the child, including providing birthday and Christmas cards and gifts, repeatedly requesting visits, which the juvenile court subsequently directed to occur monthly *via* "virtual visitation" from prison, suggesting his niece as a kinship caregiver, and corresponding monthly with the child welfare agency. Despite the father's active interest in the child, and the concurrent goals of reunification

and placement with a fit and willing relative, the child welfare agency made no efforts to promote reunification prior to filing the termination petition.[5]

In contrast, in this case, the record reveals that Father did not take an active interest in Child over the course of her life. Although the certified record does not reveal the dates of his incarceration, Father testified he was incarcerated at the time of Child's birth.[6] N.T., 2/25/14, at 91. At the time of the termination hearing, Child was six years old, and Father was residing in a halfway house. *Id.* at 26, 76. Father testified he has been incarcerated for "three-and-a-half, close to four" years of Child's life. *Id.* at 92.

Brian Bell, the DHS caseworker, testified that Family Service Plan ("FSP") objectives for Father were first established prior to Child's adjudication at a meeting in March of 2011.[7] Mr. Bell testified that Father's

_____

[5] We note that this Court previously affirmed the order denying a prior involuntary termination petition filed by the same agency because the record supported the orphans' court finding that the father demonstrated an active interest in the child but the agency provided the father effectively no assistance. *See In re D.C.D.*, 68 A.3d 362 (Pa. Super. 2013) (unpublished memorandum). Ten weeks after this Court's decision, the agency filed a new termination petition, which resulted in the decree described above.

[6] The record likewise fails to reveal Father's criminal convictions that resulted in his incarceration.

[7] Mr. Bell explained that the FSP meeting was held prior to Child's adjudication because DHS had an open file on the family, which included, in addition to Child, a younger sibling who is not a subject of this appeal. N.T., 2/25/14, at 13-14. Father's FSP objectives were to maintain contact with Child and participate in a drug and alcohol evaluation and follow through with all treatment recommendations, *inter alia*. *Id.* at 15-16.

whereabouts were unknown at that time. *Id.* at 30; *see also* DHS Exhibit #5, at p. 4. Thereafter, on September 29, 2011, DHS filed a dependency petition, and a hearing was scheduled for October 25, 2011. *Id.* at 7-8. The record reveals that Father was served with the dependency petition at the State Correctional Institution ("SCI") Forest. Father, acting *pro se*, filed a motion for continuance dated October 7, 2011, wherein he alleged notice of the adjudication hearing, that he is incarcerated at SCI Forest, and that he "does not wish to lo[]se his [p]arental [r]ights as [he] cares dearly for the welfare of his daughter. . . ." N.T., 2/25/14, at DHS Exhibit #3, at ¶¶ 1-2. Further, Father alleged he will be released from prison on November 4, 2011, "his [d]ebt to [s]ociety will be paid in full," and he will contact an attorney upon his release with respect to the dependency hearing. *Id.* at ¶¶ 3-4. As such, Father requested a continuance of thirty days, or whatever amount of days the court deemed fair and just. *Id.* at ¶ 5. By letter dated October 8, 2011, and addressed to counsel for DHS, Father, acting *pro se*, repeated the same. N.T., 2/25/14, at DHS Exhibit #4.

On October 18, 2011, the court appointed James W. Martin, Esq., to represent Father in the dependency matter. Attorney Martin appeared at the adjudication hearing on October 25, 2011, and he requested a continuance so that Father could be present at the next listing. The court granted Attorney Martin's request and rescheduled the adjudication hearing for November 15, 2011. At the hearing on November 15, 2011, Attorney

Martin again appeared, but Father did not. The court adjudicated Child dependent on that date.

Mr. Bell testified that, after Father failed to appear for the adjudication hearing, he conducted either a parent locator search ("PLS") or an internet search and found that Father was incarcerated at SCI Forest.[8]   N.T., 2/25/14, at 17, 31-32.  By letter dated January 26, 2012, mailed to Father at SCI Forest, and copied to Attorney Martin, Mr. Bell advised Father of a permanency hearing scheduled for February 8, 2012.  **Id.** at 31-32; **see also id.** at DHS Exhibit #6.  Although the January 26, 2012 letter did not include Father's prisoner identification number, Mr. Bell testified the letter was never returned by the postal service.  **Id.** at 18, 20.  Attorney Martin attended the hearing on February 8, 2012, but Father did not.  Thereafter, the record indicated that permanency hearings were held at regular intervals, and Attorney Martin attended each one, but Father did not.

Mr. Bell testified that the next FSP meeting, after the initial one in March of 2011, was held on April 19, 2013.  **Id.** at 20.  Mr. Bell invited Father to the FSP meeting by letter dated March 20, 2013, mailed to Father

---

[8] The record does not reveal if Father was re-incarcerated, or if, contrary to his allegation in his motion for continuance, he was never released on November 4, 2011.

at an address in Philadelphia,[9] and copied Father's attorney of record, Attorney Martin. *Id.* at 20-21; *see also id.* at DHS Exhibit #7. There is no indication in the record that Father responded to this invitation.

In fact, the record reveals that DHS heard from Father only one time, by telephone, which was subsequent to his notice of the filing of the termination petition. Father testified he made the telephone call to DHS in December of 2013, and Mr. Bell testified he received the call in January of 2014. N.T., 2/25/14, at 45, 75. Father testified that, during this telephone conversation, he "asked Mr. Bell was there any way that he would be able to set up a visit, some type of visitation for me and [Child] so I could get to know her before my [termination] hearing." *Id.* at 79.

Thus, the record reveals that DHS served Father with notice of the adjudication hearing. Father contacted both the court and counsel for DHS requesting a continuance of the hearing, which the court subsequently granted upon a renewed request by Father's court-appointed counsel. Father did not appear for the hearing, and DHS never heard from Father again until he received notice of the filing of the termination petition despite DHS locating him and notifying him as described above. In the interim, Father's counsel was aware of the permanency hearings and attended each

---

[9] Mr. Bell did not testify with respect to how he obtained this address, but it was not a prison address, and there is no indication in the record that it was a halfway house.

one. Based on this evidence, we reject Father's contention that DHS failed to provide good faith reasonable efforts prior to the filing of the termination petition. Father provides no legal authority, nor are we aware of any, that supports his contention. To the contrary, our case law is clear that a parent has an affirmative duty to cooperate with DHS and to demonstrate a consistent interest in his or her child. *See In re A.L.D., Jr.*, *supra; see also In re B.,N.M.*, *supra*. When a parent fails in this regard, despite notification from a child welfare agency regarding his or her child's dependency matter, an agency has fulfilled its mandate and can do no more. As such, Father's first issue on appeal fails. [10]

Further, the testimonial evidence demonstrates that Father's conduct warrants termination of his parental rights pursuant to Section 2511(a)(1). Mr. Bell testified as follows:

Q. [S]ince [Child] went into placement, did [Father] ever send you any money or checks for [Child]?

A. No.

Q. Did [Father] ever sent any birthday cards to you for [Child]?

A. No.

---

[10] The Child Advocate did not file an appellee brief with this Court. During the termination hearing, the Child Advocate opposed the termination of Father's parental rights on the basis that DHS failed to provide reasonable efforts to reunify Father and Child. *See* N.T., 2/25/14, at 101-103. Based on the foregoing reasons, we reject this argument.

Q. Did [Father] ever send any birthday presents to you for you to give to maternal Grandmother for [Child]?

A. No.

Q. Did [Father] ever send any kind of presents to acknowledge any special occasion or holiday for [Child]?

A. No.

Q. Has [Father] ever contacted you to inquire about [Child]'s physical well[-]being since she has been in placement?

A. No.

Q. Did [Father] ever request from you any photographs of [Child]?

A. No.

Q. Did [Father] ever have a visit with [Child]?

A. Not while I had the case.

N.T., 2/25/14, at 25-26.

Father testified that, for the approximately two and one-half years he was not in custody during Child's life, he attempted on one occasion to see Child. *Id.* at 92-93. Specifically, Father testified that, in either 2010 or 2011, he "ran into" Child's maternal uncle. *Id.* at 93. He testified that, "I got two contact numbers. One of the numbers fell through and the other number was [for Mother] herself, and at the time she was in Friends Hospital." *Id.* Father testified that he "was under the assumption . . . [Child] was staying with [Mother]'s brother and sister-in-law." *Id.* Further, he testified:

- 15 -

Q. Did you make any attempts to go over to the brother's house?

A. No.

Q. Ever try to call the brother?

A. Yes.

Q. But you made no attempts to go over there?

A. No.

Q. Did you ever try to arrange visitation with the brother?

A. Absolutely.

Q. What happened?

A. I seen [Child] once.  We met up at a McDonald's down on Front and Girard. . . .

*Id.* at 94.  In addition, upon inquiry by the trial court, Father testified as follows:

THE COURT: When was your last communication with [Child]?

[Father]: I haven't had anything with her.

THE COURT: Since when?

[Father]: Since she was born.  She was one year old.

N.T., 2/25/14, at 90.

Thus, the testimonial evidence demonstrates that, during the nearly four years of Child's life that Father was incarcerated, he failed to utilize the resources available to develop and continue a relationship with Child. Likewise, during the two and one-half years of Child's life that Father was

not incarcerated, he never communicated with Child or saw her more than once. The record overwhelmingly supports the trial court's finding that Father evidenced a settled purpose of relinquishing parental rights or refused or failed to perform his parental duties for more than the requisite six-month period preceding the filing of the termination petitions. Father's second issue fails.

In his final issue, Father baldly asserts that DHS did not meet its burden in terminating his parental rights pursuant to Section 2511(b). We disagree.

With respect to the bond analysis pursuant to Section 2511(b), our Supreme Court confirmed that, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). The Court further stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268 (citation omitted). Moreover, the Court directed that, in weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind." The Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.* at 269.

In its Rule 1925(a) opinion, the trial court found as follows:

There was unrefuted testimony that Father has had no contact with the Child except one time when she was an infant. Mr. Bell also testified that the Child never asked about her Father. Father has been completely absent from the Child's life and the Child does not even know her Father. Based on the for[e]going, no parent-child bond could possibly exist between Father and Child.

There was, however, competent testimony that indicated that the Child has a close bond with her maternal grandmother, [] whom she has lived with for more than half of her life. There was testimony that the Child is thriving in her current home and looks to her grandmother for care and support. . . . It is clear that the maternal grandmother's home is a safe, stable, and loving home and is the only home that the Child has known for most of her young life.

Trial Court Opinion, 5/9/14, at 12-13; *see also In re Adoption of J.M.*, 991 A.2d at 324 (stating that, "in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists"). The testimonial evidence supports the court's findings.

Mr. Bell testified that Child, who was age six at the time of the termination hearing, has lived with her maternal grandmother for approximately three and one-half years. N.T., 2/25/14, at 25. Kiana Sawyer, the Delta Social Services worker who visits Child in the home twice per month, testified that Child lives in maternal grandmother's home with her younger sister. *Id.* at 58. Ms. Sawyer testified that Child "is doing very well. She is thriving. . . ." *Id.* at 57-58. Further, Ms. Sawyer testified that a bond exists between Child and her maternal grandmother. *Id.* at 63. Based upon our thorough review, we discern no abuse of discretion by the

trial court in concluding that terminating Father's parental rights "would best serve the developmental, physical, and emotional needs and welfare" of Child. Father's final issue on appeal fails. Accordingly, we affirm the decree involuntarily terminating Father's parental rights pursuant to Sections 2511(a)(1) and (b).

Decree affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/16/2014